# United States Tax Court

T.C. Memo. 2023-19

LEIGH C. FAIRBANK AND BARBARA J. FAIRBANK,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 13400-18.                    Filed February 23, 2023.

————

*Robert S. Williams* and *Samuel T. Houston*, for petitioners.

*Sean P. Deneault*, *Edward A. Waters*, *Mark J. Tober*, *David D. Duncan*, and *A. Gary Begun*, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WEILER, *Judge*: This case arises from a notice of deficiency dated April 12, 2018, in which the Internal Revenue Service (IRS or respondent) determined income tax deficiencies for taxable years 2003, 2004, 2005, 2006, 2007, 2008, 2009, and 2011 (years at issue) of $20,088, $5,078, $6,136, $23,011, $10,785, $15,910, $28,130, and $95,994, respectively, and accuracy-related penalties under section 6662[1] of $4,018, $1,016, $1,227, $4,602, $2,157, $3,182, $5,626, and $19,199, respectively. After concessions,[2] the issues for decision are whether

————

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code (Code), Title 26 U.S.C., in effect at all relevant times, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts are rounded to the nearest dollar.

[2] As part of a Stipulation of Settled Issues dated November 19, 2021, respondent conceded that there is no deficiency in income tax due for tax year 2011. Therefore, the taxable years at issue include only 2003 through 2009.

**[\*2]** (1) respondent's notice of deficiency was issued timely under section 6501, (2) respondent's adjustments to petitioners' federal income tax for the years at issue should be sustained on account of Mrs. Fairbank's beneficial ownership of a foreign account held at Union Bank of Switzerland (UBS), and (3) petitioners are liable for accuracy-related penalties under section 6662(a) and (b)(1) for the tax years at issue.

Petitioners maintain that respondent's assessment in this case is time barred by the three-year period of limitations in section 6501(a). Respondent, however, argues the period of limitations for assessment remains open under section 6501(c)(8) since petitioners failed to file the requisite information returns related to Mrs. Fairbank's foreign bank accounts with their joint Forms 1040, U.S. Individual Income Tax Return. We agree with respondent's position and hold petitioners have failed to properly report Mrs. Fairbank's beneficial ownership in her foreign UBS account; accordingly, the period of limitations under section 6501 remained open at the time respondent's notice of deficiency was issued. Therefore, we sustain respondent's determination of tax deficiencies and penalties against petitioners as set forth herein.

## FINDINGS OF FACT

This case was tried during the Court's Jacksonville, Florida, remote trial session. At trial the parties stipulated to most of the facts, which are so found. Petitioners resided in Florida when they timely filed their Petition on July 9, 2018. This case concerns Mrs. Fairbank's transfers with foreign banking institutions in Switzerland during tax years 2003 through 2009.

## I.  *Petitioners' Background*

Petitioners have been married since 2003 and were U.S. citizens during all relevant years at issue. While petitioners resided in Sopchoppy, Florida, when the Petition was filed, Mrs. Fairbank previously resided in Fullerton, California.

### A.  *Mr. and Mrs. Fairbank*

Leigh Fairbank earned a bachelor's degree from West Point and holds a master's degree in business from Georgia State University.

Mrs. Fairbank's legal name is Barbara Jean Fairbank. Mrs. Fairbank was formerly known as Barbara Hagaman, and she held a U.S. passport during all relevant years at issue. Mrs. Fairbank holds an

[*3] associate's degree from Stephens College in Columbia, Missouri. During much of her adult life Mrs. Fairbank was mostly a homemaker and has seldom worked outside the home. Before her marriage to Mr. Fairbank, Mrs. Fairbank was married to Earl Hagaman, whom she had met in 1960. On November 24, 1961, Mrs. Fairbank married Mr. Hagaman in California, and together they had four children. Their marriage was coming to an end in early 1981 when Mrs. Fairbank (then Mrs. Hagaman) separated from Mr. Hagaman.

B.   *Mr. Hagaman*

Mr. Hagaman was a certified public accountant (CPA) and generally worked for large corporations throughout his marriage to Mrs. Fairbank, until late 1977, when he became an oil broker and began working for his own companies. Before starting his own business ventures, Mr. Hagaman had a successful career in industry working for companies such as Hughes Aircraft, United Convalescent Hospital, Litton Industries, and Urich Oil Co. Being well versed in financial matters, Mr. Hagaman took care of the family finances during his marriage to Mrs. Fairbank. Mr. Hagaman held financial accounts or foreign entities in Liechtenstein, New Zealand, and Switzerland. In 1985 Mr. Hagaman became a permanent resident of New Zealand.

Despite Mr. Hagaman's personal financial success, he failed to file federal income tax returns for tax years 1980 through 1982, a period during which he moved in excess of $16 million from banks in the United States to banks in Switzerland and New Zealand. On April 7, 1983, the IRS served summonses on Mr. Hagaman concerning his failure to pay income tax from 1980 through 1982 on profits earned in an oil brokerage business. On July 25, 1985, the IRS sent Mr. Hagaman and Mrs. Fairbank (then Mrs. Hagaman) a Notice of Jeopardy Assessment and Right of Appeal (jeopardy assessment notice) regarding tax years 1980 through 1982. In the jeopardy assessment notice the IRS stated that Mr. Hagaman had "engaged in sham operations, involving the purchase and sale of crude oil, and [had] derived large profits from these activities."

According to the jeopardy assessment notice, these foreign operations earned Mr. Hagaman substantial income within the United States which he failed to report on his federal income tax returns. The total amount of tax, additions to tax, and interest due in the jeopardy assessment notice was $14,766,694 for tax years 1980 through 1982. On March 3, 1987, the IRS issued Mr. Hagaman and Mrs. Fairbank a Notice of Levy concerning their joint federal income tax liabilities of

[*4] $18,145,524 for tax years 1980 through 1982. The Notice of Levy was served upon Bank of America in Marina del Rey, California, with a summons requesting additional information about accounts held jointly and individually by Mr. Hagaman and Mrs. Fairbank.

On May 9, 1990, Mrs. Fairbank received innocent spouse relief from her joint and several federal income tax liabilities under section 6013(e) for tax years 1980 and 1981 pursuant to a stipulated decision of this Court. Mr. Hagaman agreed to settle his federal income tax deficiencies (with the IRS) for tax years 1980 through 1982 and a stipulated decision reflecting such was entered by this Court on May 9, 1990.

C.    *Mr. Hagaman and Mrs. Fairbank's Divorce and Child Support Agreements*

In early 1981 Mr. Hagaman and Mrs. Fairbank separated, and a Final Judgment of Dissolution of Marriage was granted on May 21, 1982, by the Los Angeles County Superior Court (Superior Court). As part of the divorce proceedings, Mr. Hagaman and Mrs. Fairbank signed an Agreement of Interim and Partial Distribution of Community Property (interim agreement). At the time the interim agreement was signed in 1983, Mr. Hagaman and Mrs. Fairbank had yet to resolve all issues regarding the allocation of their community property and liabilities from their marriage. The interim agreement's validity and enforceability was not dependent upon the approval of the Superior Court, and it was subject to nondisclosure provisions since it was intended to remain a private matter as between the parties. During the divorce proceedings, Mrs. Fairbank was represented by her attorney, Robert Brock.

According to the interim agreement, Section V, Temporary Child Support, Mr. Hagaman agreed to pay Mrs. Fairbank child support of $500 per month per child for a total of $1,000 per month commencing on April 1, 1983, and continuing until the child turned 18, died, became self-supporting, married, was emancipated, or was not residing with Mrs. Fairbank, or until further order of court, whichever event came first. Despite the terms of the interim agreement, Mr. Hagaman subsequently orally agreed to pay Mrs. Fairbank child support of $40,000 per year for 20 years and then to divide the remaining community assets between them. Mr. Hagaman kept his word pursuant to the oral amendment to the interim agreement and made the child

[*5] support payments to Mrs. Fairbank, who noted receiving $40,000 in child support for years 1984 through 1988.

Notwithstanding the terms of the interim agreement and the subsequent oral amendment thereto, Mr. Hagaman and Mrs. Fairbank again orally amended the interim agreement in December 1989 when Mrs. Fairbank traveled with their children to New Zealand for the holiday season. The second oral amendment to the interim agreement resulted in Mr. Hagaman's agreeing to make three lump-sum cash payments. Under the terms of the second oral amendment, these three lump-sum payments were to be made in January 1990, October 1993, and October 1995, respectively, and in the amounts of $190,000, $190,000, and $160,000, respectively. The interim agreement was silent as to any foreign bank accounts. From December 2005 to October 2012, Mr. Hagaman and Mrs. Fairbank renewed litigation in the Superior Court over their divorce, principally involving the unresolved division of their community property.

As part of this renewed litigation, on November 29, 2007, Mr. Hagaman filed with the Superior Court a Responsive Declaration to Order to Show Cause or Notice of Motion for Injunctive and Other Restraining Orders. In his declaration, Mr. Hagaman stated that the "payments to [Mrs. Fairbank] were made through an attorney in Switzerland, Dr. Walter Müllhaupt, to [Mrs. Fairbank's] attorney, Dr. Xavier Lienert, in Switzerland." Mr. Hagaman further stated that Mrs. Fairbank "wanted the payments to be made to her Swiss establishment, Xavana Establishment."

On October 23, 2012, the Superior Court entered a Judgment on Reserved Issues. The included stipulation notes Mrs. Fairbank's assertion that Mr. Hagaman's "payments for additional child support were made by deposit of funds into an account in the name of Xavana Establishment, an entity formed in Switzerland or Liechtenstein."

[*6] II.     *Foreign Bank Accounts/Entities and Child Support Payment Structure*

A.     *Xavana Establishment*[3]

Xavana Establishment's foundation deed states that INTROMEX Treuunternehmen[4] Reg., Mauren (INTROMEX), founded Xavana Establishment on March 2, 1983, in Mauren, Liechtenstein, and is its appointed representative. According to the Contract of Mandate, Karin Bühler is to operate Xavana Establishment "on a trust basis according to the instructions of the [c]lient, whether these instructions be communicated to her directly by the [c]lient or through a representative designated by the [c]lient by registered letter." The client referenced in the Contract of Mandate is Rolf Besser, one of the Swiss attorneys with whom Mrs. Fairbank corresponded regarding Xavana Establishment. Ms. Bühler worked for INTROMEX and in her capacity as trustee she received "a fixed annual fee of . . . 2,000 [Swiss francs]" along with reimbursement for cash expenses and special tasks.

Xavana Establishment was funded with 30,000 Swiss francs for the "investment and management of assets." The statutes of Xavana Establishment state, at Article 7, that Xavana Establishment's "capital may not be divided into shares." According to Article 9 of the statutes, the capital of Xavana Establishment "and its results as well as any clear profits of . . . [Xavana] Establishment shall be due to the beneficiaries, which shall be designated by the founder," and that such a designation can be made in a "revocable or irrevocable way."

On November 19, 2001, a "Declaration of the contracting partners(s) regarding economic beneficiary" of Xavana Establishment was signed by Dr. Lienert wherein Mrs. Fairbank is listed as the beneficial owner of Xavana Establishment, with an address in Sopchoppy, Florida, and a previous address in Fullerton, California. Additionally, the "Profile of the business relationship" concerning Xavana Establishment, which was likewise signed by Dr. Lienert on November 19, 2001, describes the beneficial owner, Mrs. Fairbank, as a "[d]ivorced woman with [four], now grown-up, children" and notes the economic background of the assets as being from the "[d]ivision of property according to . . . [Mrs. Fairbank's] divorce [in] 1983." On the

---

[3] Xavana Establishment was organized as an Anstalt under the laws of Liechtenstein.

[4] Treuunternehmen is German for a trust company/enterprise.

**[*7]** "Profile of the business relationship" form, Dr. Lienert attests that he has "known [Mrs. Fairbank] since 1983." Xavana Establishment[5] appears to have held a single asset, namely a UBS account ending in 0857 (UBS account 0857 or UBS account), which had a sole beneficiary.

### B.    *UBS Account 0857*[6]

The UBS account was opened in March 1983 in the name of Xavana Establishment.[7] On March 11, 1983, Dr. Lienert signed the UBS "[d]eclaration on the opening of an account . . . by a Swiss National bound by professional secrecy" and confirmed that the beneficial owner of the assets to be deposited with the bank is "known to him personally." UBS records reflect that Mrs. Fairbank is the beneficial owner of UBS account 0857. UBS records also reflect that, as of February 25, 2003, Mrs. Fairbank was not to receive any correspondence at her U.S. address; rather, all correspondence was to be sent to Dr. Lienert in Switzerland. As a result, UBS never mailed account statements to Mrs. Fairbank in the United States.

As of March 9, 1983, Oswald Bühler and Dr. Lienert had sole signatory authority over the UBS account, and on February 25, 2003, Dr. Lienert signed a waiver of right to invest in U.S. securities on behalf of Xavana Establishment. On April 3, 2008, Dr. Lienert resigned from his role as signatory on the UBS account and, as of that date, all correspondence concerning the UBS account was to be sent to Mr. Besser. Despite no longer being a signatory on the UBS account, Dr. Lienert, on July 6, 2004, informed UBS that Mrs. Hagaman had remarried and now bears the surname Fairbank. Moreover, Dr. Lienert

---

[5] According to a UBS account document titled "'Domiciliary Companies' Decision Sheet" dated February 18, 2003, Xavana Establishment is noted as not being a "[c]ompany, institute, foundation, trust company, etc., operating in trade, manufacturing or any other business of a commercial type in the country of domicile." It is further noted that Xavana Establishment does not "[o]wn business premises" or have "staff working exclusively for [it]." Lastly, UBS records indicate that Xavana Establishment is "[d]omiciled in a 'tax haven.'"

[6] UBS records indicate that UBS account 0857 was invested in mutual funds, including UBS Investment Funds. Moreover, UBS Income Statements for UBS account 0857 reflect interest income generated between 2003 and 2009 in the same amounts listed in the notice of deficiency, except for 2009.

[7] On December 31, 2001, UBS account 0857 had a balance of $1,406,735, most (approximately 90%) of which was invested in bonds.

[*8] provided UBS updated copies of Mrs. Fairbank's passport,[8] which she had provided to him. Similar to the records concerning Xavana Establishment, UBS records reflect that Dr. Lienert, on November 17, 2004, informed UBS that Mrs. Fairbank had moved and now lives in Sopchoppy, Florida.

C.      *Neue Privat Bank*

Xong Services, Inc. (Xong Services), was incorporated in the British Virgin Islands on April 1, 2009. Mr. Besser was the sole member of the board of directors of Xong Services and was appointed first director of the company. On May 6, 2009, Xong Services issued to Mrs. Fairbank 50,000 shares of stock, which made her the sole shareholder of the foreign corporation. In accordance with a consent action of the sole director of Xong Services, Mr. Besser facilitated Xong Services' opening of a foreign bank account at Neue Privat Bank (NPB) in Zurich, Switzerland. Mr. Besser was the authorized signatory on the NPB account. On May 14, 2009, Mr. Besser wrote a letter to UBS directing it to transfer an initial tranche of $500,000 from UBS account 0857 to the National Bank of Dubai, United Arab Emirates, in the name of International Investments Holding Ltd. In that same letter, Mr. Besser informed UBS that the balance in UBS account 0857 would be transferred out of the account by the end of May 2009. In a subsequent letter dated May 25, 2009, Mr. Besser directed UBS to transfer the "remaining amount of approx[imately] [$]490,000.00 . . . to the account already specified . . . [in the May 14, 2009, letter]."[9] NPB records reflect Mrs. Fairbank as the beneficial owner of the NPB account and note her address as being in Sopchoppy, Florida.[10] An NPB account statement

---

[8] UBS records included photocopies of Mrs. Fairbank's U.S. passports. One of the passports bore the name Barbara Jean Hagaman (issued May 3, 1994), and the other bore the name Barbara Jean Fairbank (issued March 4, 2004). The photocopy of Mrs. Fairbank's 2004 U.S. passport includes a handwritten note: "Namensänderung aufgrund Heirat," which indicates that Mrs. Fairbank's surname has changed because of marriage.

[9] On July 21, 2009, Mr. Besser wrote Ms. Bühler and informed her that Mrs. Fairbank had developed other plans for the money held by Xavana Establishment and that "all accounts at UBS AG are [to] be netted out . . . [and that Mrs. Fairbank] no longer requires Xavana [Establishment]."

[10] NPB records contain a letter dated May 8, 2009, from Mr. Besser, in which he details the "beneficial ownership and the background of the assets surrounding Xong Services Ltd." In the letter, Mr. Besser explains that

**[\*9]** from May 31, 2009, indicates that the NPB account, held in the name of Xong Services, was funded with approximately $979,462.[11]

In a July 7, 2009, correspondence with NPB, Mr. Besser informs the Swiss bank that, per its request, he will be providing a copy of Mrs. Fairbank's passport. NPB records include a photocopy of Mrs. Fairbank's U.S. passport (issued March 4, 2004).[12] Just as the UBS records indicated that Mrs. Fairbank was not to receive any correspondence in the United States with respect to UBS account 0857 and that all correspondence be sent to Dr. Lienert (and subsequently to Mr. Besser), so too did the NPB records, which indicated that all "correspondence and statements are to be mailed regularly to" Mr. Besser in Zurich, Switzerland. Consequently, Mrs. Fairbank never received NPB account statements in the United States.

### D. *Child Support Payments/Mrs. Fairbank's Use of Foreign Accounts*

Mr. Hagaman retained Swiss attorneys Dr. Bernhard Hagenbach and Dr. Walter Müllhaupt to effect the child support payments to Mrs. Fairbank. Following their divorce in the early 1980s, Mr. Hagaman kept his word with respect to the interim agreement and the oral amendments made thereto and remitted child support payments to Mrs.

---

> [a]t the beginning of the 1980s, the later beneficial owner of the then Liechtenstein Establishment came into divorce with her husband. He had considerable problems with the IRS and left the USA hastily, leaving the beneficial owner [Mrs. Fairbank] behind with four children. Subsequently, the husband put the beneficial owner under pressure to either never receive money from him or to transfer undeclared money to a corresponding account at a Liechtenstein Establishment. The mother of four children had no choice but to consent, in particular to secure child support. The aforementioned Liechtenstein Establishment was founded for the beneficial owner, a citizen of the USA. During the following months, around 1,5 million USD flowed into this account in several large amounts. From the very beginning, a Swiss bank with a management contract took over the administration of the assets of the Liechtenstein Establishment.

Moreover, Mr. Besser notes that "repeated payments were made in favor of the beneficial owner, the assets shrank to just over . . . [$]1,0 million at the end of 2008," and that he "took over the management of the Liechtenstein Establishment in 2007."

[11] The assets held at NPB were 100% invested in fixed interest instruments, resulting in a monthly return between 0 and –0.07% on the invested funds.

[12] This is a copy of the same passport that was included in the UBS records regarding UBS account 0857 held in the name of Xavana Establishment.

[*10] Fairbank. In fact, Mrs. Fairbank retained a record of the child support payments that she had received as of January 27, 2005. Mrs. Fairbank's record notes that Mr. Hagaman paid the $40,000 of child support in years 1984 through 1988. Similarly, Mrs. Fairbank's record also notes the receipt of $190,000 in 1990 and 1993, which corresponds to the lump-sum child support payments that Mr. Hagaman orally agreed to pay.

On August 25, 2006, Dr. Lienert requested that UBS transfer $100,200 from UBS account 0857 to an account held in his name at UBS. On August 30, 2006, petitioners deposited a $50,000 check from UBS Zurich (dated August 25, 2006) into their joint bank account at USAA Federal Savings Bank. The UBS check was made payable to Barbara Fairbank. Similarly, on August 30, 2006, petitioners deposited $50,000 into their joint bank account at Wakulla Bank.

Just as he had done in 2006, Dr. Lienert requested on August 15, 2007, that UBS transfer $200,000 from UBS account 0857 to his UBS account. Dr. Lienert directed UBS to issue three bank checks, two for $60,000 and one for $80,000, to be debited from his account and made payable to "Mr. Leigh Fairbank" in Sopchoppy, Florida.[13] On September 6, 2007, petitioners deposited $200,000 into their joint bank account in the United States at Wakulla Bank.

On April 4, 2008, Mr. Besser (Dr. Lienert's successor), at the request of Mrs. Fairbank, requested that UBS transfer $100,000 from UBS account 0857 to the Beneficiary Dajekel Trust at the ANZ National Bank, Ltd., in Wellington, New Zealand.[14] Moreover, UBS records indicate that Mrs. Fairbank, along with Dr. Lienert, met with UBS bankers on February 21, 2008. On the same day, 500 Swiss francs was withdrawn from UBS account 0857 and ten $1,000 American Express Travelers Cheques numbered 316835887 through 316835896 were issued and likewise debited against UBS account 0857. Mrs. Fairbank deposited five American Express Travelers Cheques totaling $5,000 into petitioners' World Savings bank account on February 25, 2008. Photocopies of the American Express Travelers Cheques included in World Savings bank records indicate that the travelers cheques were signed and countersigned by Mrs. Fairbank. Furthermore, the travelers

---

[13] At trial Mrs. Fairbank confirmed that she requested that the three checks totaling $200,000 be made payable to her husband, Mr. Fairbank, rather than to her.

[14] Mrs. Fairbank testified that the $100,000 was transferred to New Zealand to pay attorney's fees associated with litigation against Mr. Hagaman.

[*11] cheques deposited into petitioners' World Savings bank account bear cheque numbers 316835891 through 316835895, which are within the tranche of cheque numbers borne by the American Express Travelers Cheques issued by UBS on April 4, 2008.

With respect to Mrs. Fairbank's NPB account, which was opened in 2009 by Xong Services, Mrs. Fairbank was issued an NPB travel cash card on July 8, 2009. Mrs. Fairbank's travel cash card was repeatedly loaded with $10,000, the maximum allowed by the bank. From August 21, 2009, to March 24, 2011, Mrs. Fairbank used her NPB travel cash card to withdraw more than $220,000.

### III.  *Petitioners' Federal Income Tax Returns*

For the tax years at issue, petitioners timely filed their joint Forms 1040, which were prepared by Rex Holly, a CPA in California. In preparing petitioners' annual tax returns, Mr. Holly would send them a tax organizer, on which petitioners generally checked "No" to the question about foreign bank accounts. Consequently, the tax returns contain no information concerning UBS account 0857 or Xavana Establishment. Moreover, for the tax years at issue, petitioners did not report any income or deductions relating to UBS account 0857, make an election under either section 1295 or 1296, file Form 3520, Annual Return To Report Transactions with Foreign Trusts and Receipt of Certain Foreign Gifts, or file Form 3520–A, Annual Information Return of Foreign Trust With a U.S. Owner, with respect to Xavana Establishment. Furthermore, for the tax years at issue, on Forms 1040, Schedules B, Interest and Ordinary Dividends, Part III, petitioners answered "No" to the questions of whether they "have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account" or whether they "receive[d] a distribution from, or were . . . the grantor of, or transferor to, a foreign trust."

### IV.  *IRS's Discovery of Foreign Accounts/Entities*

In 2008 the IRS issued UBS a "John Doe" summons that requested information relating to UBS's U.S. accountholders with undisclosed foreign accounts.[15] This summons was instrumental in the

---

[15] On August 19, 2008, Mr. Besser wrote a letter to UBS which included a newspaper excerpt from Mrs. Fairbank titled: "IRS gets OK to request UBS information." The newspaper excerpt notes that a federal judge in Miami, Florida, had

[*12] U.S. Department of Justice's (DOJ) securing a settlement with UBS under which UBS admitted to engaging in a scheme of aiding U.S. clients hiding income from the IRS. In 2009 UBS entered into a deferred prosecution agreement[16] with the DOJ on charges of conspiring to defraud the United States by impeding the IRS's collection of taxes. Pursuant to the deferred prosecution agreement, UBS, in response to an order from the Swiss Financial Markets Supervisory Authority, agreed to provide the U.S. government with the identities of, and account information for, certain U.S. customers of UBS's cross-border business.[17]

On April 27, 2010, UBS sent Mrs. Fairbank a letter informing her that the IRS has submitted a request[18] to the Swiss Federal Tax Administration (SFTA) for administrative assistance concerning the procurement of Reports of Foreign Bank and Financial Accounts (FBARs). UBS informed Mrs. Fairbank that she was included in the administrative assistance program since she was the "beneficial owner of Xavana Establishment and its accounts with UBS AG." In 2010 UBS complied with the IRS's request and consented to SFTA to release to the IRS "all of the FBAR forms filed . . . during the period of 1999 to 2009 and all other relevant declarations."

Petitioners' tax returns for the years at issue were selected for IRS examination, and Revenue Agent Robert W. Wood III was assigned to the matter. On July 18, 2012, petitioners met with Revenue Agent Wood and provided him with a copy of the information that they had regarding Xavana Establishment and UBS account 0857, including, among other things, formation documents, an asset management agreement form, account transfer requests, UBS correspondence,

---

granted the U.S. government's request for a court order directing "UBS to produce records identifying U.S. taxpayers with accounts at UBS in Switzerland who elected to have their accounts remain hidden from the IRS." Mr. Besser indicates that Mrs. Fairbank "asked if this process might be 'of any concern' for us or for [UBS]." Mr. Besser states his belief that "a request from the IRS to UBS is unlikely to trigger any feedback" since the "assets belonging to Xavana Establishment do not belong to . . . [Mrs. Fairbank], but to Xavana [Establishment]."

[16] As part of the deferred prosecution agreement, UBS agreed to pay the U.S. government $780 million in fines, penalties, interest, and restitution.

[17] Sometime in September 2010 respondent received bank records from UBS concerning UBS account 0857.

[18] According to the UBS letter, Mrs. Fairbank first received notice of the request for administrative assistance from the IRS to the SFTA in September 2009.

[*13] etc.[19] On March 27, 2014, petitioners' counsel provided Revenue Agent Wood with a copy of the information petitioners had regarding Xong Services and the NPB account, including Xong Services' certificate of incorporation, a stock certificate listing Mrs. Fairbank as the sole shareholder of Xong Services, the NPB account contract, monthly account statements, etc.[20]

The IRS used the records and information it received from September 2010 through March 2014 concerning Mrs. Fairbank's foreign accounts to make the proposed adjustments reflected in the notice of deficiency.

## V.  *Petitioners' Foreign Account Reporting*

Upon the advice of counsel, petitioners filed Forms 5471, Information Return of U.S. Persons With Respect to Certain Foreign Corporations, reporting Xong Services for tax year 2009 through 2010. Respondent received Forms 5471 regarding Xong Services on June 18, 2015. Additionally, on February 11, 2014, petitioners filed FBARs, reporting Mrs. Fairbank's NPB account for tax years 2009 through 2011. During the tax years at issue (or thereafter), petitioners never filed Forms 3520 or 3520–A regarding Xavana Establishment.

## VI.  *Notice of Deficiency*

The IRS mailed petitioners a notice of deficiency on April 12, 2018. The IRS determined tax deficiencies and penalties relevant to this Opinion as follows:

---

[19] On or about January 9, 2014, respondent received additional information relating to Xavana Establishment, including bank statements for UBS account 0857, Xavana Establishment's foundational deed, correspondence between representatives of Xavana Establishment and UBS, beneficial ownership forms listing Mrs. Fairbank as the beneficial owner of both Xavana Establishment and UBS account 0857, and photocopies of Mrs. Fairbank's U.S. passports.

[20] By letter dated October 14, 2013, NPB informed Mrs. Fairbank that the DOJ was conducting investigations and law enforcement efforts against individuals and entities that use foreign bank accounts to evade U.S. taxes and reporting requirements. In the letter NPB informed Mrs. Fairbank that it would have to submit particularized information regarding accounts held by U.S. persons, covering a period dating back to August 1, 2008.

**[\*14]**

| Year | Deficiency | Penalty I.R.C. § 6662(a) |
|---|---|---|
| 2003 | $20,088 | $4,018 |
| 2004 | 5,078 | 1,016 |
| 2005 | 6,136 | 1,227 |
| 2006 | 23,011 | 4,602 |
| 2007 | 10,785 | 2,157 |
| 2008 | 15,910 | 3,182 |
| 2009 | 28,130 | 5,626 |
| Totals | $109,138 | $21,828 |

The deficiency determinations are largely based on unreported income from Mrs. Fairbank's beneficial ownership of UBS account 0857. As relevant to this Opinion, respondent's unreported income determinations are supported by UBS income statements in the record and are outlined below:

**[\*15]**

| Year | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|
| I.R.C. § 1291(a)(1) PFIC Gain | $1,843 | — | $785 | $8,972 | $6,619 | $6,368 | $11,458 |
| Taxable Interest | 24,920 | 22,500 | 22,500 | 19,222 | 34,753 | 30,286 | 7,122[21] |
| Itemized Deductions | 2,002 | 2,473 | 2,086 | 2,616 | 2,151 | (5,986) | (21,684) |
| Social Security/RRB | — | 10,465 | 10,427 | 11,544 | — | — | — |
| Capital Gain/Loss | — | — | — | (3,000) | (9,091) | — | — |
| Total Adjustments | $28,765 | $35,438 | $35,798 | $39,354 | $34,432 | $30,668 | ($3,104) |

## OPINION

### I. *Summary of the Parties' Arguments*

Petitioners' principal contention is that all the adjustments in the notice of deficiency are time barred pursuant to section 6501(a) since the notice of deficiency was not issued within the applicable period of limitations. Respondent counters that the IRS timely issued a notice of deficiency because the period of limitations remained open under section 6501(c)(8) since petitioners failed to notify the Secretary of certain foreign transfers with respect to Xavana Establishment and UBS account 0857. More specifically, respondent argues that section 6501(c)(8) is applicable and that the period of limitations remains open for the years at issue since petitioners never furnished the information that was required to be reported under section 6048. Petitioners aver that even if section 6501(c)(8) were to apply, they furnished the information required to be reported under section 6048. In order to

---

[21] Respondent concedes that petitioners' taxable interest for tax year 2009 is $6,122, rather than the $7,122 reflected in the notice of deficiency.

**[\*16]** ascertain whether the applicable period of limitations has lapsed, we must first determine the proper entity classification of Xavana Establishment for U.S. federal tax purposes. Petitioners argue that Xavana Establishment should be classified as a controlled foreign corporation (CFC), while respondent contends that it is properly classified as a foreign trust.

II.    *Entity Classification*

The Code prescribes the classification of various organizations for federal tax purposes. Treas. Reg. § 301.7701-1(a)(1). "Whether an organization is an entity separate from its owners for federal tax purposes is a matter of federal tax law and does not depend on whether the organization is recognized as an entity under local law." *Id.* In general, an arrangement will be treated as a trust if it can be shown that the purpose of the arrangement is to vest in trustees responsibility for the protection and conservation of property for beneficiaries who cannot share in the discharge of this responsibility and, therefore, are not associates in a joint enterprise for the conduct of business for profit. *See Elm St. Realty Tr. v. Commissioner*, 76 T.C. 803, 814–15 (1981); Treas. Reg. § 301.7701-4(a). The four elements of a trust for federal tax purposes are (1) a grantor, (2) a trustee that takes title to property for the purpose of protecting or conserving it, (3) property, and (4) designated beneficiaries. *See* Treas. Reg. § 301.7701-4(a).[22]

This Court applies a facts and circumstances analysis when determining whether an arrangement should be treated as a trust or a business entity by determining whether the arrangement includes (1) associates and (2) an objective to carry on a business and divide the gains therefrom. *See Elm St. Realty Tr.*, 76 T.C. at 809–18; *see also Morrissey v. Commissioner*, 296 U.S. 344, 356–58 (1935). The absence of either of these essential characteristics will cause an entity to be classified as a trust. *See Estate of Bedell v. Commissioner*, 86 T.C. 1207, 1218 (1986); *Elm St. Realty Tr.*, 76 T.C. at 818.

When distinguishing between an association and a trust for tax classification purposes, relevant features of the arrangement are its "nature," "purpose," and "operations." *See Swanson v. Commissioner*, 296 U.S. 362, 365 (1935); *Morrissey v. Commissioner*, 296 U.S. at 357. In assessing these features, weight should be given to the arrangement's

---

[22] It is widely accepted under the laws of all 50 states of this country, and in many other countries, that a trust consists of these four elements.

**[\*17]** organizing documents. *See Swanson v. Commissioner*, 296 U.S. at 363–65; *Morrissey v. Commissioner*, 296 U.S. at 360–61. The Supreme Court noted that the "parties are not at liberty to say that their purpose was other or narrower than that which they formally set forth in the instrument under which their activities were conducted." *Helvering v. Coleman-Gilbert Assocs.*, 296 U.S. 369, 374 (1935).

Respondent argues that under the facts and circumstances analysis, Xavana Establishment qualifies as a trust. Xavana Establishment's organizing documents state that it is to operate "on a trust basis," its purpose is the "investment and management of assets," and its "capital and its results as well as any clear profits of [Xavana] Establishment shall be due to the beneficiaries." It is irrefutable that Mrs. Fairbank is reflected as the beneficial owner of Xavana Establishment; and the record does not indicate that Xavana Establishment involved any business associates or operated as a joint enterprise that conducted business. In fact, Xavana Establishment is explicitly noted as neither owning any business premises nor employing any staff working exclusively for it. Furthermore, Xavana Establishment did not operate any trade, manufacturing, or any other business of a commercial type. Accordingly, we conclude that Xavana Establishment is properly classified as a trust for federal tax purposes under Treasury Regulation § 301.7701-4(a).[23]

The arrangement here closely resembles a typical trust whereby a settlor (here, Mr. Hagaman)[24] establishes a trust for the benefit of

---

[23] Petitioners argue that Xavana Establishment is properly classified as a business entity and cites IRS Chief Counsel Attorney Memorandum 2009-012 (attorney memorandum). While the attorney memorandum does conclude, on the basis of certain information presented by respondent at the time, that Liechtenstein "Anstalts" or "Establishments" are generally not treated as trusts under Treasury Regulation § 301.7701-4(a), petitioners' reliance is misplaced for several reasons. *See* I.R.S. Chief Couns. Att'y Mem. AM2009-012, 2009 WL 3336014 (Oct. 16, 2009). First, this Court is not bound by the attorney memorandum, which clearly states that it "may not be used or cited as precedent" pursuant to section 6110(k)(3). *Id*. Second, a Liechtenstein Anstalt or Establishment is not classified as a corporation under Treasury Regulation § 301.7701-2(b)(8)(i). Last, the classification and treatment of a foreign entity for federal tax purposes is a matter of U.S. federal tax law. *See* Treas. Reg. § 301.7701-1(a)(1). Therefore, we are not persuaded by petitioners' argument that Xavana Establishment is properly classified as a business entity under Treasury Regulation § 301.7701-2.

[24] On the basis of the record, Mr. Hagaman was the grantor of Xavana Establishment, funding its UBS account 0857 with approximately $1.5 million constituting child support payments to Mrs. Fairbank.

**[*18]** specified beneficiaries (Mrs. Fairbank), contributes property to the trust (30,000 Swiss francs, which was used to fund the trust in 1983), and designates a trustee (Mr. Bühler, Dr. Lienert, and Mr. Besser) to hold the property for the beneficiaries and act in their best interest. *See, e.g.*, *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 572 (1985) (noting that a trust is generally denoted by the vesting of duties in a trustee, including a duty to preserve and maintain trust assets); *Owner Operator Indep. Drivers Ass'n, Inc. v. Comerica Bank (In re Arctic Express Inc.)*, 636 F.3d 781, 792 (6th Cir. 2011) (citing Restatement (Third) of Trusts for common law definition of a "trust"); *United States v. De Bonchamps*, 278 F.2d 127, 133 (9th Cir. 1960) (noting that a relationship is generally classified as a trust if it is "clothed with the characteristics of a trust"); *Hart v. Commissioner*, 54 F.2d 848, 850–51 (1st Cir. 1932), *rev'g in part* 21 B.T.A. 1001 (1930); *Johnson v. Commissioner*, 108 T.C. 448, 475 (1997), *aff'd in part, rev'd in part on other grounds*, 184 F.3d 786 (8th Cir. 1999); George Gleason Bogert, et al., Bogert's Trusts and Trustees § 582 (2016).

Consequently, we agree with respondent and find that the governing documents concerning Xavana Establishment, along with other documents in the record, show that Xavana Establishment was a trust for federal tax purposes.

Now that we have determined that Xavana Establishment is properly classified as a trust for federal tax purposes, our analysis turns to the issue of whether Xavana Establishment is a domestic trust or a foreign trust. A foreign trust is "any trust other than a trust" that is a "United States person" (i.e., a domestic trust). I.R.C. § 7701(a)(30)(E), (31)(B); Treas. Reg. § 301.7701-7(a)(2). Treasury Regulation § 301.7701-7(a) provides a two-factor test to determine whether a trust is domestic. A trust is domestic if (1) "[a] court within the United States is able exercise primary supervision over the administration of the trust" (court test) and (2) "[o]ne or more United States persons have the authority to control all substantial decisions of the trust" (control test). *Id.* subpara. (1). Failure to satisfy either the court test or the control test will result in the trust's being deemed a foreign trust for federal tax purposes. *Id.* subpara. (2).

A trust satisfies the court test if the governing document does not direct that the trust be administered outside of the United States, the trust, in fact, is administered exclusively in the United States, and the trust is not subject to an automatic migration provision that would move it outside the United States if a U.S. court were to attempt to assert

**[\*19]** jurisdiction. Treas. Reg. § 301.7701-7(c)(1), (4)(ii). With respect to the control test, control means having the power, by vote or otherwise, to make all of the substantial decisions of the trust, with no other person having the power to veto any of the substantial decisions. *Id*. para. (d)(1)(iii). Substantial decisions are those decisions that are "authorized or required" under the trust instrument and applicable law, which include, but are not limited to, decisions concerning whether and when to distribute income or corpus, the amount of any distribution, whether to terminate the trust, etc. *Id*. subdiv. (ii).

In this case Xavana Establishment fails to satisfy the court test as defined by section 7701(a)(30)(E)(i). There is nothing in the record to suggest that a court within the United States was able to exercise primary supervision over the administration of Xavana Establishment. In fact, the Contract of Mandate, which is part of the organizing documents concerning Xavana Establishment, states that the parties agree that "disputes relating to this [c]ontract . . . shall be subject to the law of the Principality of Liechtenstein" and that the "place of jurisdiction is agreed as Vaduz, [Liechtenstein]." Accordingly, we find that Xavana Establishment fails the court test. I.R.C. § 7701(a)(30)(E)(i); Treas. Reg. § 301.7701-7(a)(1)(i), (c)(1).

Consequently, Mrs. Fairbank's ownership interest in Xavana Establishment, a foreign trust, gives rise to reporting obligations under section 6048.[25]

---

[25] We find that Xavana Establishment does satisfy the control test under Treasury Regulation § 301.7701-7(a)(1)(ii). It is undisputed that Mrs. Fairbank was a U.S. person during the tax years at issue. UBS records indicate that Mrs. Fairbank made substantial decisions within the meaning of Treasury Regulation § 301.7701-7(a)(ii) by corresponding with Dr. Lienert and Mr. Besser to effect transfers from UBS account 0857 to herself, to her husband, and to a trust account in New Zealand. *See* Treas. Reg. § 301.7701-7(d)(1)(ii)(A). UBS records also indicate that in July 2009 Mrs. Fairbank requested that the remaining funds held in UBS account 0857 be transferred to the NPB account and stated that the Xavana Establishment would no longer be required. *See id*. subdiv. (ii)(E). Nothing in the record suggests that any other person had the power to or attempted to veto Mrs. Fairbank's choice in making these substantial decisions. *See id*. subdiv. (iii). Therefore, we find that Xavana Establishment satisfies the control test. *See* I.R.C. § 7701(a)(30)(E)(ii); Treas. Reg. § 301.7701-7(a)(1)(ii), (d)(1). Notwithstanding satisfaction of the control test, Xavana Establishment is properly classified as a foreign trust since it fails the court test. *See* I.R.C. § 7701(a)(30)(E)(i); Treas. Reg. § 301.7701-7(a)(2).

[*20] III.    *Reporting Obligations*

The Code requires disclosures regarding foreign trusts. *See* I.R.C. § 6048. Pursuant to section 6048(b), each United States person[26] who is treated as the owner of any portion of a foreign trust, under the grantor trust rules of sections 671 through 679, is responsible for ensuring that the trust annually "makes a return . . . which sets forth a full and complete accounting of all trust activities and operations for the year, the name of the United States agent for such trust, and such other information as the Secretary may prescribe." I.R.C. § 6048(b)(1)(A). This prescribed information is provided by filing Form 3520–A. *See Rost v. United States*, 44 F.4th 294, 298 (5th Cir. 2022); *Wilson v. United States*, 6 F.4th 432, 434 (2d Cir. 2021). Moreover, any United States person who is a beneficiary of a foreign trust and receives any distribution from that foreign trust must file an information return that includes the name of the trust, the aggregate amount of the distribution received from the trust during the taxable year, and such other information as the Secretary may prescribe. I.R.C. § 6048(c)(1). Per IRS guidance, this mandatory reporting requirement is satisfied when the U.S. beneficiary files Form 3520. *See* I.R.S. Notice 97-34, 1997-1 C.B. 422; *see also Wilson*, 6 F.4th at 434.

Respondent argues that Mrs. Fairbank is the owner of the foreign trust pursuant to section 679(a), which provides that any United States person who directly or indirectly transfers property to a foreign trust shall be treated as the owner for his taxable year of the portion of the trust attributable to that property if for the year there is a United States beneficiary of any portion of the trust. Respondent relies on *SEC v. Wyly*, 56 F. Supp. 3d 394, 414–16 (S.D.N.Y. 2014), and avers that Mrs. Fairbank merely named Mr. Hagaman the grantor of Xavana Establishment to avoid triggering section 679(a) and to circumvent the grantor trust rules. We are not persuaded by respondent's argument, and we are unable to conclude that Mrs. Fairbank is deemed the owner of Xavana Establishment under section 679(a). Respondent has neither introduced evidence that sheds a light on Mr. Hagaman's citizenship status at the time the foreign trust was established nor shown to our satisfaction that Mr. Hagaman was acting as Mrs. Fairbank's nominee in 1983, the year in which Xavana Establishment was founded.

---

[26] A "United States person" includes U.S. citizens and residents. I.R.C. § 7701(a)(30)(A).

**[\*21]** However, "[w]hen a grantor or other person has certain powers in respect of trust property that are tantamount to dominion and control over such property, the Code 'looks through' the trust form and deems such grantor or other person to be the owner of the trust property and attributes the trust income to such person." *Estate of O'Connor v. Commissioner*, 69 T.C. 165, 174 (1977); *see also* I.R.C. § 671. A person other than the grantor shall be treated as the owner of any portion of a trust with respect to which that person has a power exercisable solely by himself to vest the corpus or the income therefrom in himself. I.R.C. § 678(a)(1).

Mrs. Fairbank exercised authority over Xavana Establishment, and the record provides numerous instances in which Mrs. Fairbank corresponded with Dr. Lienert and Mr. Besser to effect transfers from UBS account 0857 to herself, to her husband, and to a trust account in New Zealand. Dr. Lienert even escorted Mrs. Fairbank during her in-person visit to UBS in February 2008 when she received travelers cheques and made a cash withdrawal from her UBS account.[27] Consequently, we find that Mrs. Fairbank's powers over Xavana Establishment (and its UBS account) were sufficiently extensive to cause her to be the owner thereof under section 678. *See Estate of O'Connor*, 69 T.C. at 174. Therefore, as the owner of Xavana Establishment, Mrs. Fairbank was obligated to file Form 3520–A during the tax years at issue. *See* I.R.C. § 6048(b)(1)(A).

The documentary evidence in the record has established that Mrs. Fairbank was the beneficial owner of both Xavana Establishment and UBS account 0857 during the tax years at issue. Furthermore, Mrs. Fairbank, as the beneficiary, received distributions and was obligated to file Form 3520 to provide respondent the requisite information in accordance with I.R.S. Notice 97-34. *See Wilson*, 6 F.4th at 434. Accordingly, Mrs. Fairbank, as a United States person deemed the owner of Xavana Establishment and its named beneficiary, held reporting obligations under the Code to file both Forms 3520–A and 3520.

Next, we address petitioners' contention that they complied with their filing obligations under section 6048, notwithstanding their failure

---

[27] This in-person visit to UBS is corroborated by UBS bank records and the records maintained by the U.S. Department of Homeland Security's TECS system, which indicate that Mrs. Fairbank departed from Zurich, Switzerland on February 23, 2008.

**[\*22]** to report Mrs. Fairbank's ownership interest in either Xavana Establishment or UBS account 0857 on any IRS prescribed forms; therefore, the period of limitations on assessment under section 6501 has passed.

IV.   *Statute of Limitations*

In general, section 6501(a) provides that any tax imposed under the Code shall be assessed within three years after the return was filed (whether or not the return was filed on or after the date prescribed) and no proceeding in court without assessment for the collection of the tax shall be begun after the expiration of that period.

For a timely filed return, the three-year period begins to run as of the due date of the return. *See* I.R.C. § 6501(b).[28] It is undisputed that petitioners timely filed their Forms 1040 for the years at issue and it is also undisputed that more than three years had passed between these tax return filings and the time respondent issued the notice of deficiency at issue.[29] In fact, eight or more years had passed since the filings of petitioners' Forms 1040 for the years at issue.

Subsection (c) provides for a number of exceptions to the general three-year period of limitations rule found in section 6501(a). In this case, respondent asserts subsection (c)(8), entitled "Failure to notify Secretary of certain foreign transfers," is applicable. Section 6501(c)(8) provides as follows:

> In the case of any information which is required to be reported to the Secretary under section 6038, 6038A, 6038B, 6046, 6046A, or 6048, the time for assessment of any tax imposed by this title with respect to any event or period to which such information relates shall not expire before the date which is 3 years after the date on which the

---

[28] For a return filed before the due date, the filing date of the return is deemed to be the return's due date. *See* I.R.C. § 6501(b)(1).

[29] For example, petitioners timely filed their 2009 Form 1040 on or before April 15, 2010, while the IRS issued its notice of deficiency in this matter some years later on April 12, 2018.

**[\*23]** Secretary is furnished the information required to be reported under such section.[30]

Respondent argues that section 6501(c)(8) applies since petitioners failed to report the foreign transactions pursuant to section 6048 during the tax years at issue. As we have established above, petitioners were required to report Mrs. Fairbank's interest in Xavana Establishment, and the parties agree that section 6501(c)(8) is applicable; however, they disagree over the specific phrase "furnished the information required to be reported under [section 6048]" of section 6501(c)(8).

Petitioners contend that no specific form is required under section 6501(c)(8) and argue that they provided the IRS the "information required to be furnished" under section 6048 pursuant to a request by the IRS in 2014; therefore, the period of limitations is closed, and the assessment is time barred. Petitioners further argue that had they filed Forms 3520–A and 3520, they would "simply be transposing the information already provided to the IRS onto an IRS form." Respondent argues that section 6501(c)(8) is not satisfied "unless and until a taxpayer has filed the required information returns [Forms 3520–A and 3520]."

Now we turn to section 6048(b) and (c) to determine the statutory reporting obligations of Mrs. Fairbank as the United States owner and beneficiary of Xavana Establishment and whether petitioners have furnished the information required to be reported under that section. Section 6048(b), entitled "United States Owner of foreign trust," provides that each United States person treated as the owner of any portion of a foreign trust shall be responsible to ensure that (A) the trust makes a return for the year which sets forth a full and complete accounting of all trust activities and operations for the year, the name of the United States agent for such trust, and such other information as the Secretary may prescribe and (B) the trust furnishes such information as the Secretary may prescribe to each United States person (i) who is treated as the owner of any portion of the trust or (ii) who

---

[30] In a 2010 amendment to section 6501(c)(8), Congress added a reasonable cause exception for failure to furnish the information required under this section, effective for returns filed after March 18, 2010. Petitioners did not adequately raise the issue of reasonable cause for their failure to comply with the reporting obligations under section 6048.

**[\*24]** receives (directly or indirectly) any distribution from the trust. I.R.C. § 6048(b)(1).

Section 6048(c), entitled "Reporting by United States beneficiaries of foreign trusts," provides that any United States person who receives (directly or indirectly) during any taxable year of the person any distribution from a foreign trust shall make a return with respect to that trust for the year which includes (A) the name of the trust, (B) the aggregate amount of the distributions so received from the trust during the taxable year, and (C) the other information as the Secretary may prescribe. I.R.C. § 6048(c)(1).

Petitioners' citation of section 6501(c)(8) and their argument on brief that the period of limitations has run is incomplete.[31] Section 6501(c)(8) refers the reader to the requirements under section 6048; therefore, a detailed analysis of a taxpayer's statutory obligations under section 6048 is necessary. We conclude that Mrs. Fairbank, as the deemed U.S. owner of Xavana Establishment, has failed to provide any written return to respondent setting forth a full and complete accounting of Xavana Establishment's activities for the years at issue. *See* I.R.C. § 6048(b)(1). Similarly, we conclude that Mrs. Fairbank, as Xavana Establishment's U.S. beneficiary, has failed to make any return that includes the name Xavana Establishment and which outlines the aggregate amount of distributions she received during each of the tax years at issue from Xavana Establishment. *See* I.R.C. § 6048(c)(1).

Finding that petitioners have not complied with section 6048(b) and (c), we similarly find that the period of limitations has not expired under section 6501(c)(8). Our conclusion is consistent with those of other courts that have considered this issue. *See Rost*, 44 F.4th at 298; *Wilson*, 6 F.4th at 434.

Accordingly, we are constrained to conclude that the period of limitations has not expired for the tax years at issue since petitioners

---

[31] On brief petitioners state that "the Court must determine what qualified as the 'furnishing' of 'information required to be reported under [section 6038 and/or 6048].'" However, there is little analysis by petitioners of how these legal requirements were in fact satisfied, notwithstanding their failure to file either Form 3520–A or Form 3520. Rather, petitioners continue to maintain that Mrs. Fairbank was unaware of her interest in the foreign trust and that petitioners furnished to the IRS, during the audit, bank statements, banker notes, transaction ledgers, internal letters, incorporation documents, and other correspondence notes "between agents of Xavana Establishment and UBS."

**[\*25]** neither filed IRS Form 3520–A or Form 3520 nor satisfied their reporting obligations under section 6048, assuming those obligations could be satisfied without the filing of the forms prescribed by the IRS.[32] Consequently, we find respondent's notice of deficiency in this case was timely issued.[33]

## V.  *Deficiencies*

Generally, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving error. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Section 61(a) provides that gross income "means all income from whatever source derived," including gains derived from interest. I.R.C. § 61(a)(4). However, a special rule applies to determinations of unreported income. In cases of unreported income, the Commissioner's determinations are presumptively correct if supported by a minimal evidentiary foundation connecting the taxpayer with an income-

---

[32] The U.S. Supreme Court has also held that certain documents drafted by taxpayers that do not comply with the forms prescribed by the Secretary will nevertheless be treated as valid returns, for purposes of the statute of limitations, if they contain certain elements. *See Badaracco v. Commissioner*, 464 U.S. 386, 397 (1984); *Commissioner v. Lane-Wells Co.*, 321 U.S. 219 (1944); *Zellerbach Pager Co. v. Helvering*, 293 U.S. 172 (1934); *Lucas v. Pilliod Lumber Co.*, 281 U.S. 245 (1930); *Florsheim Bros. Drygoods Co. v. United States*, 280 U.S. 453 (1930). In *Beard v. Commissioner*, 82 T.C. 766, 777 (1984), *aff'd*, 793 F.2d 139 (6th Cir. 1986), we summarized the Supreme Court's test for a valid return as follows:

> First, there must be sufficient data to calculate [the] tax liability; second, the document must purport to be a return; third, there must be an honest and reasonable attempt to satisfy the requirements of the tax law; and fourth, the taxpayer must execute the return under penalties of perjury.

Even if we were to consider the foregoing elements here, we cannot conclude that all four elements prescribed above have been satisfied. While the information petitioners provided the IRS was sufficient data to calculate petitioners' correct tax liabilities, there has been no showing by petitioners that the documents furnished purport to be information returns (i.e., Forms 3520–A or 3520), that they made an honest attempt to satisfy their legal obligations under section 6048, and that the information was furnished under penalties of perjury. Moreover, petitioners have cited no precedent binding on this Court to support their contention that filing anything but Forms 3520–A or 3520 commences the running of the period of limitations under section 6501(c)(8).

[33] We note that if we were to accept petitioners' argument that a specific form is not required to trigger the running of the period of limitations, we would create uncertainty in an area of the law where absolute clarity benefits both the IRS and taxpayers.

**[\*26]** producing activity. *See Blohm v. Commissioner*, 994 F.2d 1542, 1549 (11th Cir. 1993), *aff'g* T.C. Memo. 1991-636; *United States v. McMullin*, 948 F.2d 1188, 1192 (10th Cir. 1991). Once the Commissioner has established some evidentiary foundation linking the taxpayer with an income-producing activity, the burden shifts to the taxpayer to prove that the determinations are arbitrary or erroneous. *See Blohm v. Commissioner*, 994 F.2d at 1549; *Erickson v. Commissioner*, 937 F.2d 1548, 1551–52 (10th Cir. 1991), *aff'g* T.C. Memo. 1989-552.

To satisfy his burden, respondent has introduced extensive banking records concerning UBS account 0857. These records establish that from 2003 through 2009, Mrs. Fairbank derived income from her beneficial ownership of the UBS account, which generated income in the form of interest and gains from foreign investment instruments, namely, mutual funds, which are considered "passive foreign investment company" (PFIC) assets. The record is replete with evidence of Mrs. Fairbank's control, use, and enjoyment of the funds held in UBS account 0857. Respondent has therefore supplied a "minimal evidentiary foundation" that connects petitioners with unreported income. *See McMullin*, 948 F.2d at 1192. Consequently, petitioners bear the burden of proving that respondent's determinations of unreported income are arbitrary or erroneous.[34]

Petitioners do not deny that UBS account 0857 earned interest income and that it generated investment income from trading foreign investment instruments. Rather, petitioners contend that Mrs. Fairbank is not subject to tax since she did not have control over the accounts. In fact, Mrs. Fairbank testified that she does not "know anything about UBS," did not engage Dr. Lienert or Mr. Besser, and never asked anyone to create Xong Services on her behalf.[35] We are not convinced. Mrs. Fairbank was listed as the "beneficial owner" of both Xavana Establishment and UBS account 0857, and the records admitted into evidence show that Mrs. Fairbank exercised significant control over

---

[34] The record does not support a shifting of the burden back to respondent. *See* I.R.C. § 7491(a); *Higbee v. Commissioner*, 116 T.C. 438, 442 (2001).

[35] As the trier of fact, we observe a witness's candor, sincerity, and demeanor in order to evaluate the testimony and assign it appropriate weight in determining disputed facts. *See Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 84 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002). We are not bound to accept a taxpayer's self-serving testimony. *See Tokarski v. Commissioner*, 87 T.C. 74, 77 (1986); *Hradesky v. Commissioner*, 65 T.C. 87, 90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976). We find Mrs. Fairbank's testimony to be self-serving, unreliable, unverified, and in contradiction with some of the stipulated documents in this case.

**[\*27]** them.[36] In 2009 the remaining funds held in UBS account 0857 were transferred to Mrs. Fairbank's NPB account. Additionally, through Mr. Besser, Mrs. Fairbank indicated to UBS that all accounts were to be netted out and that she would no longer be requiring Xavana Establishment.

This course of conduct clearly shows that Mrs. Fairbank had the requisite control over the account. *See Rutkin v. United States*, 343 U.S. 130, 137 (1952) (holding that a gain "constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it"). It does not matter that Mrs. Fairbank did not withdraw additional funds from the UBS account or otherwise receive distributions therefrom. *See Harrington v. Commissioner*, T.C. Memo. 2021-95, at \*19, *aff'd*, No. 22-9000, 2022 WL 17333080 (10th Cir. Nov. 30, 2022). A taxpayer need not actually withdraw cash for an investment gain to be taxable. *See* Treas. Reg. § 1.451-2(a) ("Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time . . . ."). Petitioners provided no evidence that Mrs. Fairbank's requests that funds be transferred out of UBS account 0857 were "subject to substantial limitations or restrictions." *See id.* To the extent that Mrs. Fairbank forwent any additional transfers from her UBS account, we find that she willingly did so. *See Murphy v. United States*, 992 F.2d 929, 931 (9th Cir. 1993) (holding that a taxpayer constructively received income where "his failure to receive cash was entirely due to his own volition").

Respondent does not dispute that the funds originally transferred to UBS account 0857 were nontaxable child support payments. However, respondent argues, and we agree, that Mrs. Fairbank was required to report the activities within UBS account 0857 on her federal income tax returns during the years at issue. Consequently, we find that petitioners have not carried their burden of proving that respondent's determinations of unreported income are "arbitrary or erroneous." *See Erickson v. Commissioner*, 937 F.2d at 1554–55. Accordingly, we sustain respondent's deficiency determinations and computational adjustments

---

[36] Having already determined Mrs. Fairbank to be a beneficial owner of a foreign trust under section 678, said income of the trust is attributable to her under the grantor trust rules. *See* I.R.C. §§ 671–679.

**[\*28]** since Mrs. Fairbank earned interest and investment income from her UBS account, as outlined below.

### A. *Interest Income*

For tax years 2003 through 2009 respondent determined total taxable interest income of $160,303. While petitioners placed the entire notice of deficiency at issue, they neither presented any evidence disputing the amount of interest earned in the UBS account nor disputed respondent's characterization of this amount as interest income. Accordingly, respondent's interest income determination is sustained.

### B. *UBS Investment Income*

Through Mrs. Fairbank's beneficial ownership of UBS account 0857, she earned income from the trading of PFIC assets. *See* I.R.C. §§ 1297, 1298(a)(3). Respondent determined PFIC income and tax according to section 1291. Petitioners do not dispute the amount of PFIC income earned in the account but rather ask this Court to disallow the PFIC-related adjustments on the grounds that Xavana Establishment is properly classified as a CFC, therefore not subject to the PFIC-related adjustments under sections 1291 and 1297.[37] Having already determined that Xavana Establishment is properly classified as a foreign trust for federal tax purposes, we are not persuaded by petitioners' argument. Moreover, petitioners neither presented evidence rebutting respondent's PFIC adjustment amounts reflected in the notice of deficiency nor made an election under either section 1295 or section 1296 for the tax years at issue. Consequently, we sustain respondent's PFIC income determinations.

---

[37] By default, PFIC income is taxed according to section 1291, unless a taxpayer elects otherwise. *See* I.R.C. §§ 1291(a)–(c), 1295, 1296. In 1996 Congress enacted section 1296, allowing taxpayers to elect mark-to-market treatment. In 2002 the Secretary promulgated proposed regulations setting forth the rules for making such an election. Prop. Treas. Reg. § 1.1296-1, 67 Fed. Reg. 49,634, 49,639 (July 31, 2002). Those regulations became final in 2004. T.D. 9123, 2004-1 C.B. 907; *see* Treas. Reg. § 1.1296-1(h)(1). Under either the proposed or the final regulations, for a taxpayer's PFIC income to be taxed according to section 1296, he generally must make an election by the due date for filing his income tax return for the first year to which the election will apply. Treas. Reg. § 1.1296-1(h)(1); Prop. Treas. Reg. § 1.1296-1(h)(1), 67 Fed. Reg. at 49,642.

**[*29]** VI.    *Accuracy-Related Penalties*

Respondent determined accuracy-related penalties under section 6662(a) and (b)(1) for negligence. Section 6662(a) and (b)(1) imposes a penalty equal to 20% of the portion of an underpayment that is attributable to negligence or disregard of rules or regulations. "Negligence" includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return. I.R.C. § 6662(c); Treas. Reg. § 1.6662-3(b)(1). "Disregard" includes any careless, reckless, or intentional disregard of rules or regulations. I.R.C. § 6662(c); Treas. Reg. § 1.6662-3(b)(2)

The Commissioner bears the burden of production with respect to a penalty imposed by section 6662(a) and is required to present sufficient evidence showing that the penalty is appropriate. *See* I.R.C. § 7491(c); *Higbee*, 116 T.C. at 446–47. This includes showing compliance with the procedural requirements of section 6751(b)(1).[38] *See* I.R.C. § 7491(c); *Graev v. Commissioner*, 149 T.C. 485, 493 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016). Once the Commissioner meets his burden of production, the taxpayer bears the burden of proving that the Commissioner's determination is incorrect. *Higbee*, 116 T.C. at 447.

Pursuant to this Court's Order dated November 30, 2021, granting respondent's motion for partial summary judgment filed October 13, 2021, we find that respondent has established compliance with the managerial approval requirements of section 6751(b). Respondent has likewise satisfied his burden of production to show that the imposition of the section 6662(a) and (b)(1) penalties is appropriate since the evidence in the record shows that petitioners, during the tax years at issue, never made any attempt to comply with the federal tax reporting obligations stemming from Mrs. Fairbank's ownership interest in Xavana Establishment and UBS account 0857. Accordingly, respondent has satisfied his burden of production for the imposition of the accuracy-related penalties under section 6662(a) and (b)(1). Therefore, the only issue remaining is whether petitioners are entitled to a reasonable cause defense.

---

[38] Section 6751(b)(1) provides that no penalty shall be assessed unless "the initial determination" of the assessment was "personally approved (in writing) by the immediate supervisor of the individual making such determination."

**[\*30]** A taxpayer may avoid a section 6662(a) penalty by showing that there was reasonable cause for any portion of the underpayment and that the taxpayer acted in good faith. I.R.C. § 6664(c)(1). Reasonable cause requires that the taxpayer have exercised ordinary business care and prudence as to the disputed item. *See United States v. Boyle*, 469 U.S. 241, 246 (1985). Whether a taxpayer acted with reasonable cause and in good faith within the meaning of section 6664(c)(1) is determined on a case-by-case basis, taking into account all relevant facts and circumstances. Treas. Reg. § 1.6664-4(b)(1). The most important factor is the extent of the taxpayer's effort to assess his proper tax liability for the year. *Id*. Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable under all of the circumstances, including the taxpayer's education, experience, and knowledge. *Id*.

During the years at issue, petitioners timely filed their joint Forms 1040, which were prepared by Mr. Holly. In preparing petitioners' tax returns, Mr. Holly sent them a tax organizer each year, on which petitioners generally checked "No" to the question about foreign bank accounts. Additionally, on petitioners' Forms 1040 filed for the tax years at issue, petitioners checked "No" to the questions of whether they "have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account" or whether they "receive[d] a distribution from, or were . . . the grantor of, or transferor to, a foreign trust."

Where a taxpayer claims reliance on professional advice, section 6664(c) will apply if "the taxpayer meets each requirement of the following three-prong test: (1) the adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." *Neonatology Assocs., P.A.*, 115 T.C. at 99. The record establishes that petitioners did not satisfy this test with respect to any of their advisers who assisted preparing their federal income tax returns for the years at issue.

As for Mrs. Fairbank's reliance on Mr. Holly, petitioners have failed to demonstrate that they have satisfied the latter two prongs of the *Neonatology* test. As to the first *Neonatology* prong, we accept that Mr. Holly, as a CPA, was a competent professional who had sufficient expertise to justify reliance. As to the second *Neonatology* prong, petitioners have provided no evidence that they supplied Mr. Holly with

**[*31]** necessary and accurate information. In fact, petitioners told him that they had no foreign accounts, all while Mrs. Fairbank was corresponding with Dr. Lienert and Mr. Besser to effect transfers from UBS in Switzerland. As to the final *Neonatology* prong, petitioners have not demonstrated that their reliance on Mr. Holly was in good faith. In this case, Mrs. Fairbank provided Mr. Holly with inaccurate information regarding her ownership interests in foreign bank accounts, thereby negating the relied-in-good-faith prong.

On the basis of the facts and circumstances of this case as established by the evidence in the record, we find that petitioners are not entitled to the reasonable cause defense to the section 6662(a) accuracy-related penalties asserted and sustain respondent's determination accordingly.

VII. *Conclusion*

We have considered all of the arguments that the parties made and to the extent they are not addressed herein, we find the arguments to be moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*